ORIGINAL

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA  MAY 18  PM 2: 30

SAVANNAH DIVISION

CLERK _W Busca__

SO. DIST. OF GA.

| | |
|---|---|
| UNITED STATES OF AMERICA<br>and THE STATE OF GEORGIA<br>*ex rel.* CHAD WILLIS,<br><br>    Plaintiffs,<br><br>v.<br><br>SOUTHERNCARE, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No: **C V 4 1 0   1 2 4**

**FILED UNDER SEAL**
**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

**DEMAND FOR JURY**

## *QUI TAM* COMPLAINT

Plaintiff-Relator Chad Willis, on behalf of himself, the United States of America, and the State of Georgia, alleges and claims against Defendant SouthernCare, Inc. as follows:

## JURISDICTION AND VENUE

1.  This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized over both Plaintiffs' state and federal claims by 31 U.S.C. § 3732(a).

2.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the State of Georgia, transacts substantial business in the State of Georgia, transacts substantial business in this judicial district, and can be found here.  Additionally, and as described herein, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729.  Specifically, Defendant submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and false claims for palliative care which should have been paid for by Defendant, and submitted false records to get such claims paid.

## PARTIES

3.      Defendant SouthernCare, Inc. ("SouthernCare") is one of the nation's largest hospice providers, operating out of some 96 offices in 13 states and offering hospice service to patients who reside in private homes, nursing facilities, assisted living facilities, and hospitals.  In January, 2009, SouthernCare paid the United States over $25 million to settle allegations of improper billing for patients ineligible for the Medicare Hospice benefit and entered into a Corporate Integrity Agreement ("CIA") with the United States Department of Health and Human Services ("HHS").  As described herein, however, Plaintiff-Relator has direct personal knowledge that SouthernCare is in violation of the terms of its CIA and continues to defraud the United States and the State of Georgia.

2

4.     Plaintiff-Relator Chad Willis has been a SouthernCare Community Relations Director since 2005.  In the course of his duties, Mr. Willis has learned that SouthernCare continues to bill Medicare and Medicaid for ineligible hospice patients.  Mr. Willis has become increasingly concerned by the intense pressure applied by SouthernCare corporate management to achieve and maintain unrealistic referral and enrollment goals and by the implementation of corporate policies designed to avoid Medicare requirements and restrictions by evading regulations.  Mr. Willis has first-hand knowledge of SouthernCare's consistent practice of falsely "revoking" the hospice benefit from patients who require expensive – palliative, not curative – treatment that should be covered by the hospice *per diem* payment, and of fraudulently backdating revocation paperwork to avoid cost.     Mr. Willis' personal experience has convinced him that SouthernCare's widespread, systematic practices are designed to shift costs and inflate Medicare and Medicaid billing, all in violation of the False Claims Act and SouthernCare's CIA.  SouthernCare's continuing fraud offends Mr. Willis' long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and causes him to file this Complaint on behalf of himself, the United States, and the State of Georgia as an original-source relator under *the qui tam* provisions of the False Claims Act and the Georgia State False Medicaid Claims Act, GA. CODE ANN. § 49-4-168.  Plaintiff-Relator is serving contemporaneously

3

herewith on the United States and the State of Georgia a statement of the material evidence in his possession upon which his claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.     Background

5.     Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986. By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

4

6.     From such humble altruistic roots, Hospice has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that the Medicare Hospice Benefit represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

7.     Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home." Nevertheless, Defendants and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II.     Hospice Benefits and Reimbursements

8.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by

5

their physician. Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. Qualified beneficiaries who elect the Medicare Hospice Benefit agree to forego curative treatment for their terminal condition.

9.      Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. Medicare and/or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule that has four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC). In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services.

10.     The four categories are distinguished by the location and intensity of the services provided and the base payments for each category reflect variation in

6

expected input cost differences. Specifically, patients who are eligible for IRC and GIC hospice care qualify not only for Medicare reimbursement of in-patient hospice services, but also for federally-funded reimbursement of room and board costs at nursing homes and certain other in-patient facilities. In such instances, the patient may receive goods and services from the hospice provider that offset the costs to the nursing home of otherwise duplicative goods and services. If a patient does not qualify for IRC or GIC hospice care but only qualifies for RHC or CHC, then she may nevertheless receive hospice care while in a nursing home. However, the nursing home will not receive Medicare reimbursement for nursing home care. In any event, in order for a patient to receive hospice care in a nursing home, the nursing home must have a contract with a Medicare-certified hospice provider.

11.     Unless a hospice company provides CHC, IRC, or GIC on any given day it is paid at the RHC rate. For any given patient, the type of care can vary throughout the hospice stay as the patient's needs change. The daily payment rates are intended to cover costs that hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering a terminal illness.

### III.   The Aggregate Cap

12.     Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the Aggregate Cap). The Aggregate Cap is set by CMS

7

according to federal statute, and in 2008 stood at $22,386.13 per patient.[1]   The Aggregate Cap is not related to expenditures on individual patients.   Rather, it limits the aggregate reimbursement a provider may receive from Medicare.   A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year.    Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate Cap amount by $22,386.13.

## SOUTHERNCARE'S FRAUDULENT SCHEMES

### I.    Billing for Ineligible Hospice Patients

13.    SouthernCare's un-reformed practices are designed to defraud Medicare and Medicaid by recruiting and cycling non-qualifying patients through its Hospice program.

14.    SouthernCare effectuates its scheme by focusing intense pressure on its marketing and admission personnel, setting unrealistic admission quotas without regard for practical conditions in individual markets.    Defendant relentlessly drives its employees to maximize admissions of "undupes" or "UMAs" – Medicare-eligible patients who have never before been on the Hospice benefit, and who thus represent more Aggregate Cap dollars than patients who have been

---

[1] *See* 42 U.S.C. 1395f(i).

previously billed to Medicare and Medicaid by SouthernCare or another Hospice. Furthermore, Defendant's personnel are trained to fraudulently alter patient diagnoses in order to create the false appearance that non-terminal patients are Hospice-eligible.

15.     Plaintiff-Relator and all SouthernCare personnel are constantly reminded of periodic quotas for admissions – particularly "undupes" – and barraged with threats and corporate "double-speak."   In a very recent series of typical emails, SouthernCare Regional Director (for South Carolina and Georgia) Rachel Whitesel made clear that the "end" of meeting admission quotas justifies whatever "means" necessary.  Whitesel demanded that SouthernCare marketers "not rest until [they] hit their TARGET for April."  She admonished them that "this is **OUR** SouthernCare and we are obligated to show our commitment to growth" and that "our concentration every minute this week is hitting our TARGET ones [sic] again, 80 [admissions for the month]!!!"  Whitesel commanded: "Lets [sic] get out there and **ADMIT, ADMIT, ADMIT!!!!**"

Her follow up email of the next day was as follows:

Can you all feel the force of APRIL as we begin our final day of the month?  It is exciting to see that in the words of an old friend of mine, W. Churchill,  **"Never, Never, Never give up"** we are entering that final stretch to what can be an amazing finish.

We have rolled out the SC Way throughout the clinical world.  We have started new better evolved business plans.  We have built *synergy* that is growing.  And now we are heading towards that victory lap.

**Today** is a big admission day. *End of the month.* **Friday.**  Can it get any better?  I trust your adrenaline is rising as mine has been throughout the week.  We are hitting big numbers in regions that have been re-focused.  We are hitting tremendous success in some old stalwarts.  We have many tricks up our sleeve yet today and I can not wait to see where it takes us.

**650** is *magic.  We have just past 600*.  We admitted **59** umas on March 31....a Wednesday.  Show me what we are made of SouthernCare.  Keep me updated throughout the day.  Work together to make it happen and enjoy it!  Yes, I said enjoy it!!

Here we go.....**ADMIT! ADMIT!! ADMIT!!!!!!!!!**

Rachel Whitesel
RDCR SC/GA

16.    The words bear no possible construction except that admissions are to be made at any cost.   No mention is made of patient eligibility, patient care, employee training, compliance, or anything other than "hitting big numbers." Furthermore, the only difference between "umas" and other patients is that "umas" represent more Medicare dollars.    In fact, from Plaintiff-Relator's first-hand experience, the "tricks" SouthernCare has up its sleeve consist of admitting and billing for ineligible patients, dumping non-qualifying patients in order to avoid detection, and fraudulently revoking patients who require expensive palliative treatment.

17.    Inevitably, Defendant's tactics result in recruitment of and billing for ineligible hospice patients.  The following are merely a representative sample

10

of patients currently on the rolls in Plaintiff-Relator's location who are not eligible

for Hospice but have been billed to Medicare and Medicaid for a year or more:

| Patient | Total Days of Care | Diagnosis | Most Recent Admission Date | Most Recertification Date |
|---------|---------|---------|---------|---------|
| J.C. | 360 days | CHF | 11/03/2009 | 6/30/2010 |
| F.S. | 360 days | CVA | 10/02/2009 | 6/02/2010 |
| S.G. | 360 days | Dementia | 8/25/2009 | 5/09/2010 |
| G.B. | 420 days | General Debility | 10/10/2009 | 6/06/2010 |
| A.B. | 480 days | CAD | 12/29/2008 | 6/21/2010 |
| M.R. | 600 days | General Debility | 6/08/2009 | 6/02/2010 |
| E.H. | 840 days | General Debility | 9/30/2009 | 5/27/2010 |

18.    In order to promote and conceal its fraud, Defendant instructs its

personnel to fraudulently alter patient diagnoses in order to create the false

appearance – on paper but not in fact – that the patients are eligible for Hospice.

Plaintiff-Relator has personally witnessed SouthernCare Regional Clinical Director

Karen Jones instructing personnel to fraudulently alter patient diagnoses with the

intent of submitting false claims for ineligible patients.   The following are patients

in Plaintiff-Relator's location whose diagnoses have been fraudulently changed in

order to falsely bill the United States and the State of Georgia:

| Patient | Original Admission Date and Diagnosis | New Diagnoses and Admission Dates |
|---------|----------------------------------------|-----------------------------------|
| A.W. | 4/17/2009 - Failure to Thrive | 5/01/2009 - General Debility |
| D.H. | 05/14/2007 - CHF | 12/03/2007 - CAD<br>08/06/2008 - General Debility<br>12/12/2008 - CHF |
| P.T. | 08/05/2008 - CHF | 01/20/2009 - General Debility |
| M.C. | 04/15/2008 - Cancer | 09/05/2008 - General Debility |
| E.R. | 03/25/2008 - General Debility | 05/08/2008 - Failure to Thrive |
| K.H. | 11/14/2008 - CHF | 01/09/2009 - Failure to Thrive |

## II. Eliciting and Back-dating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care

19.     SouthernCare has for many years fraudulently increased its profit margin and shifted costs to the United States and the State of Georgia through a long-standing pattern and practice of fraudulently revoking legitimate Hospice patients who require expensive palliative hospital care.   Hospice requires that SouthernCare bear any costs for palliative care that exceed the standard per-diem amount.  The per-diem rate paid by the United States to SouthernCare, however, is generally much less than the actual per-diem cost of even a routine hospital stay for palliative treatment.   As of 2008, SouthernCare typically receives $579 per diem from CMS for a patient's palliative hospital treatment, while its contract for

12

hospital services calls for SouthernCare to pay a base level of $500 per day plus 50% of prescription medications and certain treatments and procedures. In some instances the additional cost of prescription medicine alone can reach up to $7,000 per day that a Hospice patient remains hospitalized. Unwilling to absorb such high costs of hospital care, SouthernCare fraudulently shifts these costs to the United States through false revocations. In order to boost its profit margin, SouthernCare fraudulently causes patients to revoke Hospice care for the duration of the patient's hospitalization in order to shift these expensive costs to the United States.

20. This practice of revoking legitimate Hospice patients for hospitalization is pervasive – Plaintiff-Relator estimates that 90% of SouthernCare's revoked patients are designated as seeking "aggressive treatment" when, in fact, the required treatment amounts to symptom management or other Hospice-supported palliative care. The standard practice, however, is simply to have the patient sign a revocation form in order to be admitted to the hospital and then to re-admit the patient after the hospital stay, thus fraudulently shifting the extremely high cost of hospital care, treatment, and prescription medications away from SouthernCare and onto to the United States.

21. Even more egregiously, an extremely high percentage of SouthernCare's revocations are fraudulently backdated in order to evade costs. If SouthernCare fails to elicit a revocation from the patient prior to her hospital

13

admission, it simply coerces the patient into signing the revocation form after hospital admission, leaving the date blank, then fraudulently back-dates the revocation in order to make it appear that the patient had revoked Hospice prior to hospitalization so that the hospital costs would be borne by the United States or the State of Georgia through Medicare and Medicaid.  Defendant's practice in is direct violation Title 42, CODE OF FEDERAL REGULATIONS, 418.28.   As a result of the scheme, the United States or the State of Georgia pays a full Medicare fee-per-service rate for care that it has already paid for at the lower Hospice per-diem rate. The following are SouthernCare patients who have been fraudulently revoked and readmitted repeatedly:

| Patient | DOB | Diagnosis | Admitted | Revocated | Reason |
|---------|-----|-----------|----------|-----------|--------|
| **K.H.** | x/xx/1939 | CHF | 11/14/2008 | 12/16/2008 | Seeking Aggressive Treatment |
| | | FTT | 1/09/2009 | 1/14/2009 | Seeking Aggressive Treatment |
| | | FTT | 1/23/2009 | 2/12/2009 | Seeking Aggressive Treatment |
| | | FTT | 2/24/2009 | 4/23/2009 | Discharged |

14

| Patient | DOB | Diagnosis | Admitted | Revoked | Reason |
|---------|-----|-----------|----------|---------|--------|
| **E.H.** | x/xx/1929 | CHF | 4/22/2008 | 6/02/2008 | Seeking Aggressive Treatment |
| | | | 6/03/2008 | 7/01/2008 | Seeking Aggressive Treatment |
| | | | 7/10/2008 | 2/08/2009 | Seeking Aggressive Treatment |
| | | | 2/12/2009 | 3/25/2010 | Discharged |
| **M.R.** | x/xx/1931 | Gen. Debility | 9/25/2008 | 12/07/2008 | Seeking Aggressive Treatment |
| | | | 12/09/2008 | 6/05/2009 | Seeking Aggressive Treatment |
| | | | 6/08/2009 | N/A | Patient still on services |
| **M.H.** | x/xx/1947 | CHF | 9/19/2007 | 10/01/2007 | Seeking Aggressive Treatment |
| | | | 10/25/2007 | 1/01/2008 | Seeking Aggressive Treatment |
| | | | 1/25/2008 | 1/20/2009 | Seeking Aggressive Treatment |
| **D.H.** | xx/xx/1951 | CHF | 5/14/2007 | 11/15/2007 | Seeking Aggressive Treatment |
| | | CAD | 12/03/2007 | 3/18/2008 | Seeking Aggressive Treatment |
| | | | 3/28/2008 | 7/23/2008 | Not meeting criteria |
| | | Gen. Debility | 8/06/2008 | 11/27/2008 | N. H. Placement |
| | | CHF | 12/12/2008 | 3/13/2009 | Seeking Aggressive Treatment |

22.     By   and   through   all   of   the   circumstances   described,   *supra*,

SouthernCare   has   established   itself   as   a   recidivist   violator   of   United   States

15

healthcare laws and regulations, undermined the noble intention and mission of Hospice, defrauded the United States, and jeopardized the already overly strained Medicare program.

**COUNT ONE**
**FALSE CLAIMS UNDER 31 U.S.C. § 3729**

23.   Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

24.   By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –  presented or caused to be presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)   false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice;

(b)   false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, when Defendant was aware that its practices with regard to patient admissions and revocations, described *supra*, were in violation of Medicare regulations;

16

(c)     false certifications regarding Defendant's compliance with the terms of its CIA;

(d)     fraudulent revocation forms intended to create the false appearance that patients required and elected to receive aggressive curative treatment;

(e)     false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance.

(f)     false claims for under Medicare Part A for care that should have been paid for by Defendant.

25.     The United States paid the false claims described herein and summarized in paragraph 24(a)-(f).

26.     Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare and Medicaid.

27.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims for Hospice services.

17

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT TWO
## FRADULENT INDUCEMENT UNDER 31 U.S.C. § 3729

28.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

29.     By and through the actions described herein, SouthernCare knowingly presented, or caused to be presented, to the United States false or fraudulent claims, to wit:  SouthernCare fraudulently induced the Government to pay per-patient *per-diem* fees for patient care that they never intended to provide.

30.     SouthernCare agreed to provide care to patients in return for a per-patient *per-diem* payment from the United States through Medicare.  The United States made it clear that such per-patient *per-diem* payments were consideration for SouthernCare's agreement to provide ongoing palliative patient care; and SouthernCare's agreement to provide such ongoing palliative care was – in fact – a condition of the United States' per-patient *per-diem* payments to SouthernCare.

31.     At the time that SouthernCare requested and accepted the per-patient *per-diem* payments, it intended to avoid the high costs of palliative-care procedures

18

and medications by inducing patients to temporarily revoke their Hospice election in order that such expensive procedures should be billed under Medicare Part A. To that end, SouthernCare induced the patients to revoke their Hospice election and on many occasions fraudulently back-dated such revocations in order to shift the high costs of hospital procedures and prescription medications away from SouthernCare.

32.     Accordingly, the United States was misled by SouthernCare's material misrepresentation that it would provide palliative care for such patients, which SouthernCare ultimately avoided through fraudulent revocation and back-dating of revocations.   In many instances, after the expensive procedures were completed the patients were fraudulently re-certified for Hospice.

33.     By and through the actions described *supra*, SouthernCare knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and back-dated revocation records and false claims for payment to the United States related to the per-patient *per-diem* claims for payment. Such false records or statements were used by the SouthernCare to get false or fraudulent monthly per-patient claims paid or approved by the United States.

34.     SouthernCare's fraudulent actions described herein have resulted in damage to the United States equal to the monthly per-patient payments made to the

19

SouthernCare by the United States through Medicare for all patients whose hospice election was fraudulently revoked.

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the United States and against SouthernCare in an amount equal to treble the damages sustained by reason of Hospice Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

**COUNT THREE**
**FALSE CLAIMS UNDER GA. CODE ANN. § 49-4-168.2**

35.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

36.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval and knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by such agency

37.    By and through the actions described *supra*, Defendant knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the State of Georgia through the Medicaid program and submitted false or

20

misleading information or statements to the Georgia Medicaid program for the purpose of being accepted as a Medicaid provider.

38.    Defendant's fraudulent actions described herein have resulted in damage to the State of Georgia equal to the amount paid or reimbursed to Defendant or others by the State of Georgia through Medicaid for such false or fraudulent claims, or as a result of such false records.

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the State of Georgia, and against SouthernCare, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by GA. CODE ANN. § 49-4-168.1, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(2) AND
## GA. CODE ANN. § 49-4-168.1

39.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

40.    Defendant knowingly presented, or caused to be presented, to officers and employees of the United States and the State of Georgia, false or fraudulent claims for payment or approval.

21

41.     The United States and the State of Georgia paid Defendant for such false claims.

42.     Defendant, in concert with its principals, agents, employees, and other institutions did agree to submit such false claims to the United States and the State of Georgia.

43.     Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States and the State of Georgia by submitting false claims for payment to the United States and the State of Georgia through Medicare and Medicaid.

44.     Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States and the State of Georgia equal to the amount paid by the United States and the State of Georgia to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in his favor on behalf of the United States and the State of Georgia and against Defendant SouthernCare, Inc., in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and GA. CODE ANN. § 49-4-168.1, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FIVE
## SUPPRESSION, FRAUD, AND DECEIT

45.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

46.    Defendant misrepresented or suppressed the material facts that: (1) a substantial number of its patients enrolled in Hospice do not qualify for Hospice and are not terminally ill and (2) although its false documentation indicated that its patients revoked their Hospice election and sought aggressive treatment, many such patients in fact required only palliative treatment that should have been paid for by Defendant.

47.    Defendant was legally obligated to communicate these material facts to the United States and the State of Georgia.

48.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

49.    The United States and the State of Georgia acted on Defendant's material misrepresentations described herein to their detriment.

50.    Defendant's fraudulent actions described herein have resulted in damage to the United States and the State of Georgia equal to the amount paid by the United States and the State of Georgia to Defendants and others as a result of Defendant's misrepresentations.

WHEREFORE, Plaintiff-Relator demands judgment in his favor on behalf of the United States and against Defendant SouthernCare pursuant to 31 U.S.C. § 3732 and GA. CODE ANN. § 51-6-2 in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relator may be entitled.

Date:  May __18__, 2010

_Henry Frohsin by MW w/ permission_
HENRY J FROHSIN (Pro Hac Vice)
JAMES F. BARGER, JR. (Pro Hac Vice)
J. ELLIOTT WALTHALL (Pro Hac Vice)

**OF COUNSEL:**
FROHSIN & BARGER, LLC
One Highland Place
2151 Highland Avenue, Suite 310
Birmingham, Alabama 35205
henry@frobar.com
jim@frobar.com
elliott@frobar.com

_____
KEVIN WANGERIN
(GA Bar No. 736520)

**OF COUNSEL:**
Bullard & Wangerin, LLP
P. O. Box 18107
2960 Riverside Drive, Suite 280
Macon, Georgia 31209-8107
kwangerin@bglawfirm.com

Attorneys for Plaintiff-Relator, Chad Willis

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

24

## CERTIFICATE OF SERVICE

On this the _18_ day of May, 2010, Plaintiff-Relator hereby certifies that in

compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the *Qui*

*Tam* Complaint has been executed as follows:

**By Registered Mail/Return Receipt to:**

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Edward J. Tarver, U.S.A.
Attn:  Edgar D. Bueno
United States Attorney's Office
Southern District of Georgia
100 Bull Street, 2nd Floor
Savannah, Georgia 31401

Thurbert E. Baker, A.G.
Office of the Attorney General
State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334

OF COUNSEL